74 So.3d 447 (2011)
Ex parte T.J.
(In re R.W. v. T.J. and C.W. and T.J. v. R.W. and C.W.).
2100277.
Court of Civil Appeals of Alabama.
June 24, 2011.
*448 Juliana Taylor, Montgomery, for petitioner.
Fernando Morgan of Morgan Law Firm, Montgomery, for respondent C.W.
Karen H. Jackson, Prattville, guardian ad litem, for respondent A.W. and A.W., siblings of S.W.
THOMPSON, Presiding Judge.
T.J. petitions this court for a writ of mandamus directing the Montgomery Juvenile Court ("the juvenile court") to recognize and adjudicate him as the presumed father of S.W. ("the child") and to vacate its order requiring genetic testing to establish the child's paternity.
According to the briefs and materials of the parties and the brief of the guardian ad litem of the child's siblings filed in this court in support of and in opposition to the petition for a writ of mandamus, on September 3, 2009, R.W., the child's maternal grandmother ("the maternal grandmother"), filed a petition in the juvenile court against T.J. and C.W., the child's mother ("the mother"), seeking custody of three of her grandchildren, including the child. The maternal grandmother's petition is not included in the materials submitted with this petition for the writ of mandamus.[1] However, according to the briefs submitted to this court in support of and in opposition to T.J.'s petition for a writ of mandamus, the maternal grandmother referred to T.J. as the child's father in her custody petition.
On October 30, 2009, T.J. filed a petition in the juvenile court seeking custody of the child. T.J.'s custody petition is not included in the materials before this court. However, according to the parties' briefs to this court relating to T.J.'s petition for a writ of mandamus, in T.J.'s custody petition, he claims that he is the child's father *449 and that the child has lived with him since the child's birth.
On November 13, 2009, the mother filed a petition for custody of the child. According to the briefs submitted to this court, the mother named J.H. as the father of the child. On January 22, 2010, the mother filed a motion requesting genetic testing of T.J. and J.H. to establish paternity of the child. T.J. apparently objected to the mother's motion on the ground that he had "receive[d] the child into his home and openly [held] out the child as his natural child or otherwise openly [held] out the child as his natural child" so as to give rise to a presumption of paternity pursuant to § 26-17-204(a)(5), Ala.Code 1975. None of the documents mentioned are contained in the materials submitted to this court.
On December 3, 2010, the juvenile court held a six-hour hearing on the issue of T.J.'s paternity of the child. On December 17, 2010, the juvenile court entered an order granting the mother's motion for genetic testing. On December 29, 2010, T.J. filed his petition for a writ of mandamus directing the juvenile court to recognize and adjudicate him as the presumed father of the child and to vacate the order requiring genetic testing. This court called for an answer and briefs from the other parties, and the parties have complied with that request.
In their briefs, each of the parties argues that the facts presented at the December 3, 2010, hearing support his or her respective position regarding whether T.J. is the presumptive father of the child. It is apparent from the parties' briefs that material facts are in dispute. For example, T.J. asserts that the child has always lived with him. In her brief, the mother claims that there have been times when the child has lived with her and not with T.J. T.J. asserts that paperwork the maternal grandmother completed for the child at the child's Head Start school indicated that he was the child's father. The brief of the guardian ad litem for the child's siblings, who argues against the issuance of the writ, states that the Head Start paperwork indicates that T.J. is the child's "godfather" and that it identified J.H. as the child's father. The guardian ad litem also stated that the mother's address, and not T.J.'s, was listed as the child's address on the Head Start paperwork. The parties also dispute the substance of the testimony of two of T.J.'s friends. In his brief, T.J. states that the friends said that T.J. had held the child out as his natural child. However, in the mother's brief, she states that one of those friends testified that he had heard that T.J. was not the child's biological father and that he had wondered why the child's last name was different than T.J.'s and the mother's last names.
In addition to the parties' briefs presented to this court, the juvenile court submitted a letter brief stating that clear and convincing evidence was presented at the hearing that rebutted any presumption of paternity that T.J. might have had. As the juvenile court made clear in both its order and its letter brief to this court, the evidence is undisputed that T.J. was incarcerated at the time of the child's conception. According to the juvenile court, evidence indicated that, by the time T.J. was released from incarceration, the mother was already five months pregnant with the child. The mother and T.J. have never married, and the mother has publicly identified another man as the child's father.
In its order, the juvenile court recognized that T.J. and the child had developed a parent-child type of relationship and that T.J. provided financial and emotional support to the child. However, the juvenile court also found that it was "unlikely" that T.J. believed he was the natural father of *450 the child. After weighing the evidence, the juvenile court concluded that T.J. cannot be the child's presumed father. In the order, the juvenile court stated that "there was no presumed father in this matter" and that, therefore, an order for genetic testing was appropriate. This conclusion is not inconsistent with the finding that T.J. had developed a loving and supportive relationship with the child.
As grounds for his petition for a writ of mandamus, T.J. contends that the juvenile court erred in failing to adjudicate him as the presumed father. He argues that, because he is the presumed father, no one can legally challenge his status as the child's father. Therefore, T.J. says, the juvenile court improperly ordered genetic testing to establish paternity of the child.
A writ of mandamus is an extraordinary remedy available only when the petitioner demonstrates: "`(1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court.'" Ex parte Nall, 879 So.2d 541, 543 (Ala.2003) (quoting Ex parte BOC Group, Inc., 823 So.2d 1270, 1272 (Ala.2001)). A petition for a writ of mandamus is the proper vehicle for seeking review of an interlocutory order. Ex parte A.M.P., 997 So.2d 1008, 1014 (Ala.2008). However, "[a] writ of mandamus will issue only in situations where other relief is unavailable or is inadequate, and it cannot be used as a substitute for appeal." Ex parte Empire Fire & Marine Ins. Co., 720 So.2d 893, 894 (Ala.1998) (citing Ex parte Drill Parts & Serv. Co., 590 So.2d 252 (Ala.1991)).
T.J.'s argument appears to be that no one can challenge his assertion that, pursuant to § 26-17-204(a)(5), Ala.Code 1975, he is the child's father. The Alabama Uniform Parentage Act ("the AUPA"), codified at § 26-17-101 et seq., Ala.Code 1975, sets forth the statutory criteria for determining the paternity of a child. In pertinent part, § 26-17-204(a)(5) states:
"A man is presumed to be the father of a child if:
"....
"(5) while the child is under the age of majority, he receives the child into his home and openly holds out the child as his natural child or otherwise openly holds out the child as his natural child and establishes a significant parental relationship with the child by providing emotional and financial support for the child."
Section 27-17-204(b) provides:
"A presumption of paternity established under this section may be rebutted only by an adjudication under Article 6 [§ 26-17-601 through § 26-17-638]. In the event two or more conflicting presumptions arise, that which is founded upon the weightier considerations of public policy and logic, as evidenced by the facts, shall control. The presumption of paternity is rebutted by a court decree establishing paternity of the child by another man."
(Emphasis added.)
The purpose of the December 3, 2010, hearing was to determine whether T.J. was, in fact, the presumed father of the child. In ordering genetic testing to be conducted to determine paternity, the juvenile court stated that, based upon the evidence presented at that hearing, it was "unable to find that [T.J. was] the presumed father."
As previously mentioned, § 26-17-204(a)(5) provides that a man is the presumed father of the child when "he receives the child into his home and openly *451 holds out the child as his natural child or otherwise openly holds out the child as his natural child and establishes a significant parental relationship with the child by providing emotional and financial support for the child." (Emphasis added.) It is not enough for a man to develop a loving, nurturing, parent-child type of relationship with a child to be the legally presumed father of a child.
In this case, because we do not have a record of the proceedings before the juvenile court, we simply do not have before us the means to know whether T.J. presented sufficient evidence from which to determine that he held the child out to the public as his natural child as described in § 26-17-204(a)(5); we also do not know to what extent such evidence was disputed. However, based on the materials submitted to us in support of and in opposition to the petition for a writ of mandamus, we do know that undisputed evidence demonstrates that the child did not share T.J.'s last name and that the child's mother has claimed that a man other than T.J. is the child's natural father.
It is axiomatic that such conflicts in the evidence are for the trial court to resolve. Baker v. Townsend, 484 So.2d 1097, 1098 (Ala.Civ.App.1986). Without a transcript of the six-hour hearing, we cannot conclude that there was sufficient evidence from which to hold that T.J. held himself out to the public as the child's natural father. If we were to grant the petition and issue the writ in this case, directing the juvenile court to recognize and adjudicate T.J. as the child's presumed father, we would be usurping the juvenile court's authority, without the benefit of a transcript of the hearing.
Because the evidence as set forth in the materials provided to this court tends to show that the mother was five months pregnant with the child before T.J. was released from incarceration and she began dating him, it must be recognized that T.J. cannot be the child's biological father. Therefore, we do not believe that "undue injury" will arise from the juvenile court's order granting genetic testing in an effort to determine paternity of the child. Because it has never been established that T.J. is the presumed father, he has failed to demonstrate that he has a clear legal right to a writ directing the juvenile court to vacate the order granting genetic testing to establish paternity. Thus, the proper method for T.J. to contest the juvenile court's ruling that he is not the child's presumed father is by an appeal.
For the reasons set forth above, T.J.'s petition for a writ of mandamus is due to be denied.
PETITION DENIED.
PITTMAN and MOORE, JJ., concur.
THOMAS, J., dissents, with writing, which BRYAN, J., joins.
THOMAS, Judge, dissenting.
I must respectfully dissent. I disagree that the juvenile court, despite stating in its order that it was "unable to find that [T.J. was] the presumed father," actually failed to conclude that T.J. was the presumed father under Ala.Code 1975 § 26-17-204(a)(5), a part of the Alabama Uniform Parentage Act ("the Act"), Ala.Code 1975 § 26-17-101 et seq. In order to make clear the basis upon which I believe the writ should be granted, I will quote a large portion of the order from which T.J. seeks relief.
"It is clear from the testimony of the witnesses and the admissions by the mother that [T.J.] has been in a generous and loving role towards the minor child, and that he has provided for her emotionally and financially since her *452 birth. Furthermore, it is clear from the testimony that the mother has allowed the relationship to grow and that the child calls [T.J.] `daddy.' The evidence clearly shows that [T.J.], despite knowing that the child is not or may not be his genetic child, affirmatively accepted a caregiver role as the child's father and that the child, the mother, and the maternal grandmother have relied on that acceptance.
"At the hearing, [T.J.] sought to have this Court's declaration of [T.J.'s] parentage and that he is the presumed father of [the child] pursuant to § 26-17-204(a)(5) Code of Alabama (1975), which states in pertinent part that ... `A man is presumed to be the father of a child if: while the child is under the age of majority, he receives the child into his home and openly holds out the child as his natural child or otherwise openly holds out the child as his natural child and establishes a significant parental relationship with the child by providing emotional and financial support for the child....'
"It is undisputed that [T.J.] has established a parent-child relationship with [the child]. Notwithstanding the same, it is unlikely that he believed this child to be his `natural' child when he was incarcerated at the likely time of conception. [T.J.] does not dispute that he was incarcerated from July through November in 2004 and further that he did not have a physical relationship with the mother at the likely time of conception. This court cannot ignore this fact. Further, the mother testified that she was already 5 months pregnant when [T.J.] was released from incarceration in November 2004. This court also considered the HeadStart application, which pre-dates this proceeding, wherein the mother identified another man as the father of [the child] and identified [T.J.] as the Godfather.
"Based on the foregoing, this court is unable to find that [T.J.] is the presumed father. Accordingly, the Parties may proceed with genetic testing."
As a reading of the juvenile court's factual findings makes clear, the juvenile court did determine that T.J. had, in fact, established facts amounting to a presumption of his paternity under § 26-17-204(a)(5). That section reads:
"(a) A man is presumed to be the father of a child if:
"....
"(5) while the child is under the age of majority, he receives the child into his home and openly holds out the child as his natural child or otherwise openly holds out the child as his natural child and establishes a significant parental relationship with the child by providing emotional and financial support for the child."
The juvenile court found, as a matter of fact, that T.J., who knew or at least suspected that the child was not his biological offspring, (1) "has been in a generous and loving role towards the minor child," (2) "has provided for her emotionally and financially since her birth," and (3) has "affirmatively accepted a caregiver role as the child's father." In addition, the juvenile court found that "the mother has allowed the relationship to grow and that the child calls [T.J.] `daddy'" and that T.J., the mother, and the maternal grandmother had relied on T.J.'s assumption of the role of father in the child's life. These findings clearly and without question establish that T.J. has "otherwise openly [held] out the child as his natural child and [has] establishe[d] a significant parental relationship with the child by providing emotional and financial support for the child." § 26-17-204(a)(5).[2] *453 Moreover, the juvenile court stated that "[i]t is undisputed that [T.J.] has established a parent-child relationship with [the child]."
The juvenile court then goes further, however, to determine that T.J. could not be the biological father of the child because he was incarcerated at the time of the child's conception. In support of the decision to reject T.J.'s presumed fatherhood based almost solely on this fact, the juvenile court, in its response to T.J.'s mandamus petition, first states that it determined that "clear and convincing evidence was presented which rebutted any presumption of paternity in [T.J.]." Secondly, the juvenile court states that it "found that it would be intellectually dishonest to presume [T.J.] to be the father of the child, considering the evidence presented," and explicitly declares its reliance on the Official Comment to Section 607 of the Uniform Parentage Act, which states that "[i]t is inappropriate for the law to assume a presumption known by all those concerned to be untrue." § 26-17-607, Uniform Comment.
Section 607 of the Uniform Act reads:
"(a) Except as otherwise provided in subsection (b), a proceeding brought by a presumed father, the mother, or another individual to adjudicate the parentage of a child having a presumed father must be commenced not later than two years after the birth of the child.
"(b) A proceeding seeking to disprove the father-child relationship between a child and the child's presumed father may be maintained at any time if the court determines that:
"(1) the presumed father and the mother of the child neither cohabited nor engaged in sexual intercourse with each other during the probable time of conception; and
"(2) the presumed father never openly held out the child as his own."
Even assuming that, under the Uniform Parentage Act, the juvenile court's decision to permit the mother to rebut T.J.'s presumption was proper, it is of no consequence to the decision in the present case.[3]
Alabama has not adopted Section 607 of the Uniform Parentage Act. The Alabama Comment to § 26-17-607 make this more than abundantly clear: "This section is substantially different from Section 607 of the Uniform Parentage Act (2002)." The comment goes further to explain that Alabama "follows Ex parte Presse, 554 *454 So.2d 406 (Ala.1989)[,] and its progeny that favor maintaining the integrity of the family unit and the father-child relationship that was developed therein. Once the presumed father ceases to persist in his parentage, then an action can be brought." Section 26-17-607(a) reads:
"(a) Except as otherwise provided in subsection (b), a presumed father may bring an action to disprove paternity at any time. If the presumed father persists in his status as the legal father of a child, neither the mother nor any other individual may maintain an action to disprove paternity."
(Emphasis added.)
I note that the juvenile court, in its order, focuses on the fact that "it is unlikely that [the father] believed this child to be his `natural' child when he was incarcerated at the likely time of conception." If the juvenile court believed that T.J.'s knowledge of his lack of biological parentage somehow prevented him from establishing the presumption under § 26-17-204(a)(5), I must disagree. I do not believe that subsection (a)(5) requires that, in order to establish the presumption under that subsection, a man must believe that the child is his "natural" child, i.e., that the child is his biological offspring.
I understand that the use of the word "as" in the phrase "openly holds out the child as his natural child" is perhaps not entirely clear in meaning. However, I read "as" in this context as meaning "in the way or manner that," "in accordance with what or the way in which," or "in the capacity, character, condition, or role of." Webster's Collegiate Dictionary 71 (11th ed.2003). Likewise, to "hold out," is defined as "to represent to be," id. at 592, while "represent" is defined as "to describe as having a specified character or quality." Id. at 1057. Thus, subsection (a)(5) establishes a presumption of paternity in a man who openly treats a child in the same manner he would treat his biological child, who openly treats a child in accordance with the way that a father would treat his biological child, or who openly treats the child as if the child had assumed the role of his biological child "and establishes a significant parental relationship with the child by providing emotional and financial support for the child." § 26-17-204(a)(5). Read in this way, § 26-17-204(a)(5) serves to promote a significant parental relationship over a mere biological connection. Such a reading finds generous support in comments to the Act.
The Uniform Comment to § 26-17-204 states that "courts may use the estoppel principles in § 608 in appropriate circumstances to deny requests for genetic testing in the interests of preserving a child's ties to the presumed or acknowledged father who openly held himself out as the child's father regardless of whether he is in fact the genetic father." Thus, it is clear that a presumption under § 26-17-204(a)(5) arising from a man's decision to hold the child out as his own offspring is not automatically trumped by proof that he could not possibly be the "genetic father." An examination of the Uniform Comment to Ala.Code 1975, § 26-17-608, further bolsters the conclusion that the presumption under § 26-17-204(a)(5) does not require the man seeking to establish the presumption to actually believe that he is, indeed, the biological or genetic father of the child. That comment reads:
"This section incorporates the doctrine of paternity by estoppel, which extends equally to a child with a presumed father or an acknowledged father. In appropriate circumstances, the court may deny genetic testing and find the presumed or acknowledged father to be the father of the child. The most common situation in which estoppel should be applied arises when a man knows that a child is not, or may not be, his *455 genetic child, but the man has affirmatively accepted his role as [the] child's father and both the mother and the child have relied on that acceptance. Similarly, the man may have relied on the mother's acceptance of him as the child's father and the mother is then estopped to deny the man's presumed parentage."
(Emphasis added.) Because my reading of § 26-17-204(a)(5) comports with what I believe to be a primary purpose of the Actmaintaining significant parent-child relationships despite the lack of a genetic linkI cannot agree with the juvenile court's apparent belief that T.J.'s knowledge of his likely lack of a biological connection with the child somehow prevents him from establishing the presumption to which he is entitled.
Because the juvenile court found that the evidence at the hearing established that T.J. had developed and maintained a father-child relationship with the child and that he had emotionally and financially supported the child since her birth as if she were his biological child despite his knowledge that she likely was not, I conclude that the juvenile court determined that T.J. met the requirements of § 26-17-204(a)(5) and, thus, was a presumed father under the Act. At that point, the juvenile court was prohibited by § 26-17-607(a) from allowing the mother to rebut T.J.'s presumption of paternity. Instead, the juvenile court was required to dismiss the mother's action to establish the child's paternity insofar as it sought to establish paternity in J.H. and insofar as it sought genetic testing to do so. I would, therefore, grant the petition and issue the writ of mandamus requested by T.J.
BRYAN, J., concurs.
NOTES
[1] We note that when an appellate court "considers a petition for a writ of mandamus, the only materials before it are the petition and the answer and any attachments to those documents. There is no traditional `record' submitted" as there is in an appeal. Ex parte Guaranty Pest Control, Inc., 21 So.3d 1222, 1228 (Ala.2009). Rule 21(a)(1)(B) and (E), Ala. R.App. P., provides that the petitioner is to provide this court with a "statement of the facts necessary to an understanding of the issues presented by the petition," as well as "[c]opies of any order or opinion or parts of the record that would be essential to an understanding of the matters set forth in the petition." The respondent is also given an "opportunity to supplement the `record' by attaching exhibits of its own...." Ex parte Fontaine Trailer Co., 854 So.2d 71, 74 (Ala. 2003); see also Ex parte Covington Pike Dodge, Inc., 904 So.2d 226, 232 n. 2 (Ala.2004).
[2] The main opinion relies on the juvenile court's statement that it was "unable to find that [T.J. was] the presumed father" under the Act. However, the juvenile court's determination that T.J. was not the presumed father was not a factual finding; instead, the juvenile court made a legal conclusion that T.J. was not entitled to the presumption of paternity in § 26-17-204(a)(5). I believe that the juvenile court's numerous factual findings, which were made after the juvenile court considered the testimony and resolved conflicts in the evidence and which are set out supra, form the basis for only one possible legal conclusionthat T.J. is the child's presumed father; thus, I am not reweighing evidence or usurping the role of the juvenile court. I am firmly convinced, in large part because of the language used in the juvenile court's order and by the juvenile court in its response to the mandamus petition, that the juvenile court has committed error in its application of the law.
[3] I question whether under the Uniform Parentage Act the mother would have been permitted to disprove T.J.'s presumed fatherhood because that act clearly requires not only evidence of the unlikelihood that the presumed father was involved in the conception of the child but also proof that "the presumed father never openly held the child out as his own," which would not comport with the factual findings made by the juvenile court in this case.